**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**EASTERN DIVISION**

MAURICIO RUEBEN,                                                                    PLAINTIFF
REG. #59216-079

v.                                          2:13CV00033-DPM-JTK

T. C. OUTLAW, et al.                                                              DEFENDANTS

## PROPOSED FINDINGS AND RECOMMENDATIONS

## INSTRUCTIONS

The following recommended disposition has been sent to United States District Judge D. P. Marshall Jr. Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. An original and one copy of your objections must be received in the office of the United States District Court Clerk no later than fourteen (14) days from the date of the findings and recommendations. The copy will be furnished to the opposing party. Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the District Judge, you must, at the same time that you file your written objections, include the following:

1.      Why the record made before the Magistrate Judge is inadequate.

2.      Why the evidence proffered at the hearing before the District Judge (if such a hearing is granted) was not offered at the hearing before the Magistrate Judge.

3.      The detail of any testimony desired to be introduced at the hearing before the District

1

Judge in the form of an offer of proof, and a copy, or the original, of any documentary or

other non-testimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional

evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite A149
Little Rock, AR 72201-3325

## DISPOSITION

## I.      Introduction

This matter is before the Court on the Defendants' Motions for Summary Judgment (Doc.

Nos. 44-46, 50-52).   Plaintiff filed responses in opposition to the Motions (Doc. Nos. 59-63), and

Defendants filed a Reply (Doc. No. 64).

Plaintiff Rueben is a federal inmate who filed this civil rights action pursuant to Bivens v.

Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), and the

Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671, et seq., based on the alleged inadequate

medical treatment he received from January, 2012, through July, 2012.[1]

## II.     Complaint

According to his Complaint (Doc. No. 2), Plaintiff appeared at sick call on January 12, 2012,

complaining of severe pain in his lower right leg.  (Id., p. 6.)  Defendant Hammer examined him,

and a touch to his leg caused Plaintiff to wince from the pain.  (Id.)  Plaintiff claims that by touching

---

[1]The Court granted Plaintiff's Motion to Amend, to add the Defendant United States of America, on June 25, 2013 (Doc. No. 29).

the leg to check for heat, Hammer suspected an infection, but improperly disregarded his suspicion and instead  treated Plaintiff for muscle pain by prescribing anti-inflammatory medications.  (Id.)  When the medication failed to provide relief for his pain, Plaintiff returned to sick call on January 23, 2012, where he stood in line to be "triaged." (Id, p. 7.)  Defendant Langley disregarded his complaints of pain and instructed him to watch the call-out for a later date appointment.  (Id.)

Plaintiff returned for an appointment with Defendant Hammer on February 1, 2012, explaining that his condition had worsened and that he was experiencing serious pain.  (Id., p. 8.)  Hammer asked Plaintiff questions and examined his leg, again feeling for heat.  (Id.)  Hammer told Plaintiff he was taking too much Naproxen at one time, and prescribed Plaintiff a different anti-inflammatory drug, Meloxicam.  (Id.)  On Plaintiff's request, Hammer ordered blood work and x-rays.  (Id., pp. 8-9.)   Plaintiff later wrote an inmate request to staff (forwarded to Defendants Outlaw, Heuett, Hoy, and Graham), on January 31, 2012, in which he complained of pain and frustration with the lack of adequate medical care.  (Id., p. 9.)  The response he received noted that he was evaluated and treated for pain, but failed to note that the pain had not been alleviated and the medical problem had not been resolved.  (Id.)   Plaintiff returned to sick call on February 6, 2012, for his blood work, at which time he complained that the Meloxicam did not help with his pain. (Id., p. 10.) Defendant Rios disregarded Plaintiff's complaint of pain when she told him he would be placed on call-out.  (Id.)

Defendant Wingo examined Plaintiff on February 14, 2012, pursuant to a call out appointment. (Id., p. 11.)  Wingo questioned Plaintiff, examined his leg and felt it for heat, and prescribed a different anti-inflammatory drug, Indomethacin.  (Id.)  In response to Plaintiff's question about his blood work, she responded by stating that everything looked good, and also noted

that she could not take further action until his x-rays were taken. (Id.) The x-rays were taken on February 16, 2012. (Id., p. 12.)

Plaintiff returned to sick call on February 17, 2012, to obtain the results of the x-rays and to complain about additional pain. (Id.) Defendant Miller disregarded his complaints and instructed him to watch for call out for a later date consultation. (Id.) Plaintiff wrote another inmate request to Defendant Graham on February 24, 2012, complaining about the lack of adequate care, and returned to sick call on February 27, 2012, complaining of extreme pain. (Id., p. 13.) After consulting with Defendants Rios and Peikar and discussing the possibility of a blood clot, Hammer sent Plaintiff to the emergency room at Forrest City Baptist Memorial Hospital. (Id.)

At the hospital, the doctor who examined Plaintiff ordered an ultra sound to determine if a blood clot was the cause of his pain. (Id., p. 14.) Although the ultra sound results were normal, Plaintiff's blood work indicated an infection, and he was admitted and treated with IV antibiotics for Cellulitis. (Id., pp. 14-15.) Plaintiff returned to FCI on March 2, 2012, and continued to take oral antibiotics. (Id., p. 15.) Defendant Hammer reevaluated him on March 16, 2012, when he presented with complaints of swelling and associated pain, and received a call out for later date blood work. (Id.) Plaintiff returned on April 10, 2012, to obtain the blood work results and to complain about continued leg pain. (Id.) Defendant Hammer assessed possible residual effects from the cellulitis and prescribed Prednisone for inflammation and Naproxen for pain. (Id.) Hammer was not able to tell him how long he would continue to experience pain. (Id.)

On Monday, July 9, 2012, Plaintiff arrived at sick call, complaining of leg pain and cramping, together with a request for a refill of the Naproxen. (Id., p. 17.) Defendant Langley disregarded his complaints and instructed him to watch for call-out for a later date consultation,

4

stating that they were shorthanded.  (Id.)  Plaintiff returned on July 30, 2012, and was examined by

Defendant Rios for complaints of a golf ball-sized lump below his knee which caused pain.  (Id., p.

18.)  Rios examined his leg, and could not definitively state that it was caused by the Cellulitis.  (Id).

Three weeks later, on August 14, 2012, Plaintiff was examined by Defendant Wingo, who assessed

that the lump was not sufficiently swollen to require draining fluids from it, and who instructed

Plaintiff to return if the knee became more swollen.  (Id., p. 19.)  Plaintiff returned on August 30,

2012, and Defendant Wingo placed him on call-out.  (Id., p. 20.)

Plaintiff claims that Defendants' negligent treatment of his condition, and their failure to

immediately diagnose an infection, resulted in undue pain and suffering.  He also alleges that

Defendants' actions constituted deliberate indifference to his serious medical needs.

## III.   Medical Records and Other Exhibits

First, the Court will review the medical records, undisputed by the Plaintiff, which chronicle

his  care by the Defendants.

On January 12, 2012, Plaintiff reported to health services complaining of pain in his right

leg.  (Doc. No. 51-1, pp. 12-14.)  Defendant Hammer examined Plaintiff, noting the leg appeared

normal with good skin color, but tender to palpation at the lateral aspect tibia.  (Id., p. 13.)  No

erythema was noted,[2] and Plaintiff had full range of motion in his lower extremities.  (Id.)  Hammer

prescribed Prednisone and Naproxen, and told him to follow up at sick call and chronic care clinic

as needed.  (Id.)

On January 23, 2012, Plaintiff reported to sick call, and during the triage conducted by

---

[2]Defined as a type of hypersensitivity reaction which occurs in response to medicines,
infections, or illness, and can result in fever, itching of the skin, joint aches and skin lesions.
Www.ntm.nih.gov/medlineplus/ency/article/000851.htm.

Defendant Langley, was placed on call-out. (Doc. No. 2, p. 34.) On January 31, 2012, Plaintiff sent an inmate request to staff form to Defendants Outlaw, Rivers-Graham, Hoy, and Heuett, expressing concerns with the sick call procedure and his health problems. (Id., pp. 38-43.) Defendant Heuett responded on February 13, 2012, detailing the treatment Plaintiff received and telling him to return to sick call as needed. (Id., p. 44.) Defendant Hoy also responded, and noted that Plaintiff had been evaluated by health services. (Id., p. 42.)

Plaintiff was examined again by Hammer on February 1, 2012, for complaints of right leg pain. (Doc. No. 51-1, p. 16.) He noted that the leg was tender to palpation, but had good skin color, was warm to touch, with no erythema, edema, or masses or lumps. (Id., p. 17.) He also noted that Plaintiff had full range of motion of his lower leg and ankle. (Id.) Since the Naproxen had not provided relief to Plaintiff, Hammer prescribed Meloxicam, and ordered both lab tests and x-rays. (Id., p. 18.)

Plaintiff reported to sick call on February 6, 2012, with pain at over 10 on a 1-10 scale, and Defendants Rios and Miller placed him on the call-out list. (Doc. No. 2, pp. 48-9.) Plaintiff did have lab tests on that same date. (Doc. No. 43, p. 73.) On February 8, 2012, Plaintiff was sent to an outside orthopedic surgeon for complaints related to his elbow. (Doc. No. 51-1, pp. 20-24.) These records do not include a mention of Plaintiff's leg pain, and a report prepared by FCI nurse Roberts upon his return indicated Plaintiff had no complaints other than those related to his elbow. (Doc. No. 43, pp. 40-41.)

Defendant Wingo examined Plaintiff on February 14, 2012, for continued right leg pain and a request for lab results. (Doc. No. 51-1, p. 26.) She granted his request to replace the Meloxicam with another anti-inflammatory drug, and noted that x-rays of the lower leg were pending. (Id.)

Those x-rays were taken on February 16, 2012, and read by the radiologist on February 28, 2012, noting the following impression: "Abnormal mid fibula with nonspecific characteristics.  This may be due to infections, inflammation or neoplastic changes with mild periosteal reaction suspected.  The distinction between these processes cannot be made on the basis of radiographic studies."  (Id., p. 30.)

Plaintiff returned to sick call with reports of pain on February 17, 2012, and Defendant Miller placed him on the call-out list.  (Doc. No. 2, pp. 50-51.) He submitted another inmate request to staff to Defendant Graham on February 24, 2012, and she responded on March 11, 2012, noting that he had since been evaluated and hospitalized.  (Id., pp. 52-53.)

Plaintiff returned to health services pursuant to call out on February 27, 2012, and again was examined by Defendant Hammer.  (Doc. No. 51-1, pp. 32-36.)  He noted the right lower leg was tender to palpation, with no swelling or discoloration. (Id., p. 32.)  At this point, Plaintiff could not flex his ankle, but no edema, swelling, or discoloration was noted.  (Id., pp. 32-33.)   Hammer decided to have Plaintiff transported to the local hospital, and his decision was confirmed by Defendant Resto.  (Id., pp. 33-34.)   An ultrasound taken of his right leg at the hospital was negative for blood clots.  (Id., p. 38.)

The physician's report prepared at the hospital by Dr. Candace Shafer stated that the "patient is in no acute distress," and Plaintiff did "not complain of pain on palpation, particularly of the lower right extremity calf area.  Again, there is no visible erythema, nor is there any palpable warmth nor palpable abnormality."  (Id., pp. 41-42.)   The doctor suspected Cellulitis and treated Plaintiff with IV antibiotics and pain medication.  (Id., p. 42.)

Plaintiff returned to FCI on March 2, 2012, and was assessed by a nurse and provided

prescriptions for Bactrim and Levaquin.  (Id., p. 45.)  On March 5, 2012, he was evaluated by Dr. Nader Peikar, who noted that the site of the Cellulitis had improved, but that redness and heat persisted.  (Id., p. 49.)  He gave Plaintiff a prescription for Naproxen and directed him to follow up as needed.  (Id.)  Plaintiff also returned to health services on March 16, 2012, for a follow-up examination by Defendant Hammer.  (Id., p. 52.)  Plaintiff reported feeling "much better," and Hammer renewed his Naproxen prescription together with new lab tests.  (Id., p. 53.)  On April 10, 2012, Plaintiff returned with continued reports of mild swelling and some pain.  (Id., p. 55.)  Defendant Hammer prescribed Prednisone, noting full range of motion in the right leg, no erythema, edema, or bruising.  (Id.)

Plaintiff returned to sick call on July 9, 2012, and Defendant Langley placed him on the call out list due to a shortage of staff.  (Doc. No. 2, p. 103.)  Additional medical records show that he was seen by a non-party physician for pain below his kneecap on November 20, 2012, which was diagnosed as a cystic lesion in need of draining.  (Doc. No. 43, p. 82.)

## IV.    Summary Judgment Motion

Pursuant to FED.R.CIV.P. 56(a), summary judgment is appropriate if the record shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  See Dulany v. Carnahan, 132 F.3d 1234, 1237 (8th Cir. 1997).  "The moving party bears the initial burden of identifying 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'"  Webb v. Lawrence County, 144 F.3d 1131, 1134 (8th Cir. 1998), quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (other citations omitted).  "Once the moving party has met this burden, the non-moving party cannot

8

simply rest on mere denials or allegations in the pleadings; rather, the non-movant 'must set forth specific facts showing that there is a genuine issue for trial.'" Id. at 1135.  Although the facts are viewed in a light most favorable to the non-moving party, "in order to defeat a motion for summary judgment, the non-movant cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit." Id.

### A.    FTCA claim - Defendant United States of America

#### 1.    Defendant's Motion

Defendant United States of America asks the Court to dismiss Plaintiff's negligence claim against it based on Plaintiff's failure to produce expert testimony to support his claim that the medical treatment he received fell below the standard of care in this State.  In FTCA actions, courts must apply the law of the state in which the acts complaint of occurred, and in Arkansas, claims for negligence relating to medical treatment arise under the Arkansas Medical Malpractice Act, ARK. CODE ANN. § 16-114-201, et seq.  See also Goodman v. United States, 2 F.3d 291, 292 (8th Cir. 1993).

According to the Malpractice Act,

(a)   In any action for medical injury, when the asserted negligence does not lie within the jury's comprehension as a matter of common knowledge, the plaintiff shall have the burden of proving:

(1) By means of expert testimony provided only by a medical care provider of the same specialty as the defendant, the degree of skill and learning ordinarily possessed and used by members of the profession of the medical care provider in good standing, engaged in the same type of practice or specialty in the locality in which he or she practices or in a similar locality;

(2) By means of expert testimony provided only by a medical care provider of the same specialty as the defendant that the medical care provider failed to act in accordance with that standard; and

(3)  By means of expert testimony provided only by a qualified medical expert that as a proximate result thereof the injured person suffered injuries that would not otherwise have occurred.

Ark. Code Ann. § 16-114-206(a).[3]

Defendant states that the standard of care with respect to Plaintiff's medical condition is not within a jury's common knowledge and that an expert is necessary to help the fact finder to decide the issue of negligence.  In support, Defendant cites a case where expert testimony was deemed essential to establish the standard of care in failing to diagnose appendicitis.  Reagan v. City of Piggott, 305 Ark. 77, 80-81, 805 S.W.2d 636, 638 (1991).  Similarly, expert testimony is required here to support Plaintiff's claim that Defendant's employees were negligent in failing to diagnose and treat Plaintiff's right leg pain.  And absent such, Plaintiff cannot support a claim of negligence against the Defendant.

## 2.       Plaintiff's Response

Plaintiff disagrees, stating that expert testimony is not required in this case, since he presents undisputed facts that during two months of inadequate treatment, Defendant's employees never diagnosed him with an infection.  Yet, immediately upon his admittance to the hospital, the infection was diagnosed.  This circumstantial evidence provides the common knowledge needed to show that the FCI Defendants negligently failed to treat him.  In addition, despite immediate access to x-ray technology, Defendant's employees improperly delayed taking x-rays of Plaintiff's leg in February, 2012.  Furthermore, they incorrectly managed the sick call/triage procedures when they failed to immediately treat him on certain dates and instead, placed him on call out lists.  Based on all these

---

[3]The requirement in this statute that expert testimony be provided by "medical care providers of the same specialty as the defendant" was held unconstitutional in Broussard v. St. Edward Mercy Health System, Inc., 2012 Ark. 14, 386 S.W.3d 385 (Ark. 2012).

undisputed facts, Plaintiff states negligence is obvious and expert testimony is not required.

### 3.      Defendant's Reply

Defendants note that "'mere statements of what treatment should or should not have been provided do not qualify as statements setting forth the applicable standard of care.'"  Mitchell v. Lincoln, 366 Ark. 592, 598, 237 S.W.3d 455, 459 (2006), quoting Dodd v. Sparks Reg'l Med. Ctr., 90 Ark. App. 191, 204 S.W.3d 579 (2005).  Therefore, expert testimony is required in this case to establish the standard of care of a physician's assistant or nurse in diagnosing cellulitis, that the standard was not followed, and that Plaintiff suffered injuries.  Because Plaintiff does not provide such testimony, Defendant states it is entitled to judgment as a matter of law on the FTCA claim.

### 4.      Analysis

The FTCA "gives federal district courts exclusive jurisdiction over claims against the United States for 'injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission' of a federal employee 'acting within the scope of his office or employment.'"  Millbrook v. United States, 133 S.Ct. 1441, 1442 (2013), quoting 28 U.S.C. § 1346(b)(1).  The United States is liable under the FTCA only to the extent that a private entity under like circumstances would be liable to Plaintiff in accordance with the substantive law of the state where the negligent act occurred.  28 U.S.C. § 1346(b)(1); see also United States v. Olson, 546 U.S. 43, 44 (2005).

As set forth by Defendant, claims for negligent medical care and treatment in Arkansas are governed by the Medical Malpractice Act, which requires expert testimony when the standard of care is not within the jury's common knowledge and when it is needed to help the jury decide the issue of negligence.  ARK. CODE ANN. § 16-114-206(a) (Lexis-Nexis 2006).

In this particular case, the Court finds that Plaintiff's failure to provide an affidavit or declaration of an expert to support his claim that the care provided to him by Defendant's employees fell below the applicable standard of care and was negligent, causing injuries he otherwise would not have suffered, is fatal to his case.   It is clear to the Court that Defendant's employees consistently treated Plaintiff for his leg pain, offered various anti-inflammatory and pain medications, and ordered diagnostic tests. They also arranged for his transport to the local hospital, where the initial ultrasound test proved negative for blood clots.  At the time he was admitted, the attending physician noted no trauma, fever, headache, visual blurriness, chest pain, shortness of breath, and provided that Plaintiff was "in no acute distress."  (Doc. No. 51-1, p. 41.)  Therefore, the Court finds that the concept of negligence concerning the employees' failure to diagnose his leg pain within that specific period of time as Cellulitis, is not something that would be within the common knowledge of a juror, and requires expert testimony.

### B.   Bivens claims

#### 1.   Defendants' Motion

Defendants Outlaw, Heuett, Rivers-Graham, Resto, Rios, Wingo, Miller, and Langley first ask the Court to dismiss Plaintiff's official capacity claims against them based on sovereign immunity, citing Baker v. Chisom, 501 F.3d 920, 925 (8th Cir. 2007).  They also ask that the allegations against Outlaw, Heuett, Rivers-Graham, and Resto be dismissed, as they are based on respondeat superior, which cannot be used to impose liability against them.  See Ashcroft v. Iqbal, 556 U.S. 662, 676-77 (2009).  Defendants Rios and Resto state they are absolutely immune from liability because they are employees of the United States Public Health Service.  42 U.S.C. § 233(a). And finally, all Defendants ask the Court to dismiss the individual capacity claims against them

based on qualified immunity, stating that there is no evidence that they acted with deliberate indifference to his serious medical needs.

### 2.    Plaintiff's Response

Defendant Hammer acted with reckless disregard in treating Plaintiff because he strongly suspected an infection, yet chose not to investigate it or treat it. The treatment he pursued was ineffective, and Hammer continued to prescribe anti-inflammatory drugs, knowing that Plaintiff's condition was not responding positively to such treatment. This failure to diagnose occurred over a period of two months and placed Plaintiff at great risk of injury and pain. Finally, although Hammer sent Plaintiff to the emergency room, it was under the suspicion of a blood clot, which was immediately eliminated as a cause by the physicians at the hospital.

It is also undisputed that Plaintiff reported to sick call on three occasions with intense pain, but Defendants Langley, Miller, and Rios failed in their responsibilities as "gatekeepers" by not immediately treating him on those occasions, but rather, by placing him on the call out list. Defendant Wingo was negligent in failing to conduct her own evaluation of Plaintiff's condition and basing her treatment decisions on Hammer's faulty assessment. In addition, Defendants Outlaw, Heuett, Graham, and Resto failed to appropriately respond to his inmate requests for assistance and are liable in both their individual and official capacities. Plaintiff states he continues to seek injunctive relief against them in their official capacities in the form of changes to sick call and other medical procedures.

### 3.    Defendants' Reply

Defendants Outlaw, Graham, Heuett, and Resto reiterate that Plaintiff's allegations against them in their official and individual capacities are based on their supervisory positions, and that he

13

cannot identify any facts showing their personal involvement in his medical care to provide a basis

for liability.  Furthermore, Plaintiff's allegations against the remaining Defendants, concerning the

medical treatment provided, are based on his disagreement over their decisions, which does not

support a constitutional claim.  Finally, Defendants state that Plaintiff fails to provide "verifying

medical evidence" in the record to establish a detrimental effect of any delay in his treatment.  See

Beyerbach v. Sears, 49 F.3d 1324, 1326 (8th Cir. 1995) (overruled in part on other grounds).

### 4.    Analysis

#### a.    Official Capacity Liability

Plaintiff's monetary claims against the Defendants in their official capacities should be

dismissed, as barred by sovereign immunity.  A suit against a federal government official in his

official capacity is considered a suit against the United States, and a Bivens action cannot proceed

against the United States.  See Baker v. Chisom, 501 F.3d at 925; Buford v. Runyon, 160 F.3d 1199,

1203 (8th Cir. 1998).  In addition, Plaintiff's injunctive relief claims against Defendants Outlaw,

Heuett, and Graham in their official capacities, also should be dismissed, because he sues them

based on their supervisory positions, as noted in more detail in Section IV.B.4.c.ii.

#### b.    Absolute Immunity

Defendants Rios and Resto, as employees of the United States Public Health Service, are

absolutely immune from suit for personal injury to patients, resulting from medical care.  42. U.S.C.

§ 233(a); Hui v. Castaneda, 559 U.S. 799, 812 (2010).  (See also Docs. 51-2, 51-3.)

#### c.    Qualified Immunity

Having reviewed the filings of the parties, including all exhibits, the Court finds that

Defendants are entitled to qualified immunity from Plaintiff's claims against them in their individual

capacities.  Qualified immunity protects government officials who act in an objectively reasonable manner, and may shield them from liability when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity is a question of law, not a question of fact.  McClendon v. Story County Sheriff's Office, 403 F.3d 510, 515 (8th Cir. 2005).  Thus, issues concerning qualified immunity are appropriately resolved on summary judgment.  See Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (the privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.").

To determine whether a defendant is entitled to qualified immunity, the courts generally consider two questions: (1) whether the facts alleged or shown, construed in the light most favorable to the plaintiff, establish a violation of a constitutional or statutory right; and (2) whether that right was so clearly established that a reasonable official would have known that his or her actions were unlawful.  Pearson v. Callahan, 555 U.S. 223, 232 (2009); see also Saucier v. Katz, 533 U.S. 194, 201 (2001).[4]  Defendants are entitled to qualified immunity only if no reasonable fact finder could answer both questions in the affirmative.  Nelson v. Correctional Medical Services, 583 F.3d 522, 528 (8th Cir. 2009).

In order to support a claim for an Eighth Amendment violation, Plaintiff must prove that Defendants were deliberately indifferent to a serious medical need.  Farmer v. Brennan, 511 U.S.

---

[4]Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Nelson v. Correctional Medical Services, 583 F.3d at 528 (quoting Pearson v. Callahan, 555 U.S. at 236).

825, 834 (1994).   However, even negligence in diagnosing or treating a medical condition does not constitute a claim of deliberate indifference.  Estelle v. Gamble, 429 U.S. 97, 105-06 (1976). Rather, the "prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation," Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995).  See also Smith v. Marcantonio, 910 F.2d 500, 502 (8th Cir. 1990) (holding that a mere disagreement with a course of medical treatment is insufficient to state a claim for relief under the Eighth Amendment).  Furthermore, prison physicians are entitled to exercise their medical judgment, and "do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment."  Long v. Nix, 86 F.3d  761, 765 (8th Cir. 1996).   In addition, an inmate who complains that a delay in medical treatment constitutes a constitutional violation must provide "verifying medical evidence" in the record to establish the detrimental effect of the delay, in order to succeed on his claim.  Beyerbach v. Sears, 49 F.3d at1326, quoting Hill v. Dekalb Regional Youth Detention Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994).  Finally, "[i]n the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that [he] did not feel [he] received adequate treatment."  Dulany, supra, 132 F.3d at 1240.

### i. Defendant Jeffrey Hammer

Plaintiff does not dispute that Defendant Hammer treated him on three occasions prior to his hospitalization, and at least two occasions thereafter.  (Doc. Nos. 51-1, pp. 12-14, 16-18, 32-36, 52, 55-56.)  He also does not dispute that Defendant Hammer examined him, prescribed medications for his pain and swelling, and ordered laboratory tests and x-rays.  Instead, Plaintiff claims that

16

Hammer's failure to diagnose an infection for two months, which was immediately diagnosed upon his hospitalization, constituted deliberate indifference to his serious medical needs. Plaintiff insists Hammer should have immediately arranged for x-rays to be taken on the day that they were ordered, and that his conduct in continuing to prescribe anti-inflammatory drugs, even after they were not effective, is proof of reckless disregard of Plaintiff's medical condition. In Hammer's support, he presents a letter from Dr. L. F. Anderson, a board-certified family physician at St. Vincent Medical Clinic, Lonoke, Arkansas. (Doc. No. 44-2.) Dr. Anderson states he has treated patients with similar complaints as the Plaintiff's, and after reviewing the Plaintiff's medical records, renders the opinion that Hammer "acted within and did meet the standard of care with regards to his treatment of Mr. Rueben." (Id.)

Having reviewed the Plaintiff's medical records, the Court finds as a matter of law that Defendant Hammer's conduct did not violate Plaintiff's clearly-established right to be free from cruel and unusual punishment. There is no evidence that Hammer deliberately disregarded Plaintiff's serious medical needs. In fact, the evidence is abundant that Hammer made several efforts to examine and treat Plaintiff and provide relief from his pain. "In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that [he] did not feel [he] received adequate treatment." Dulany, 132 F.3d at 1240. Therefore, Plaintiff's claims against Defendant Hammer should be dismissed.

### ii. Defendants Outlaw, Heuett, and Graham

According to Plaintiff, he submitted inmate requests to staff for assistance to these Defendants in January, 2012. Defendant Outlaw was the Warden of FCI and Defendant Heuett was

the Associate Warden.  Defendant Rivers-Graham was the Health Services Administrator.  Plaintiff does not allege that Defendants Outlaw and Heuett were personally involved in his medical treatment.  In addition, as non-medical professionals, they cannot be held personally liable for the medical staff's treatment decisions.  Webb v. Hedrick, 409 Fed.Appx. 33, 36 (8th Cir. 2010).  Plaintiff also does not allege that Defendant Rivers-Graham was personally involved in his medical care and treatment.  She received two inmate requests to staff, one in January, 2012, which was responded to by another health services administrator, Brenda Hoy, and a second one in February, 2012, to which she responded.  (Doc. No.  2, p. 52.)  This second request was submitted only three days before Plaintiff's hospitalization, and the March 11, 2012, response from her noted his subsequent care and treatment.  (Id., p. 53.)

It appears to the Court that Plaintiff's allegations against these Defendants are based solely on their supervisory positions.  In fact, in his complaint, Plaintiff alleges, "Defendants T.C. Outlaw, D.W. Heutte, W. Resto, and HSA Graham acted with deliberate indifference when they (1) collectively and individually failed in their capacity as administrators and supervisors by not properly instructing and overseeing the medical department and employees..."  (Doc. No. 2, p. 25.)

"Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal, 556 U.S. at 676.  It is clear to the Court that these defendants did not violate a clearly established constitutional right, and therefore, are entitled to qualified immunity from liability.

### iii.  Defendant Wingo

Plaintiff's claim against Defendant Wingo is based her treatment of him on February 14,

2012, and in August, 2012.  He claims that her actions in accepting Defendant Hammer's conclusions and her failure to diagnose an infection in February, 2012, were reckless.  In addition, he claims she provided false information when she told him, as recorded in the medical record, that his lab results looked good, when in actuality two components were outside their normal limits. Finally, he complains about her decision to prescribe him a different anti-inflammatory drug.

With respect to the August, 2012 treatment, Plaintiff presented with a lump below the knee. Defendant allegedly assessed the lump and concluded it was not large enough to drain, and instructed Plaintiff to return when it did become more swollen.  (Doc. No. 2, p. 19).  However, when Plaintiff did return, he did not encounter Defendant Wingo.

According to the medical record of the February 14, 2012, visit with Defendant Wingo, Plaintiff specifically asked her to prescribe Naproxen, because a different anti-inflammatory drug, Meloxicam, was not proving effective for his pain.  (Doc. No. 51-1, p. 26.) Defendant Wingo examined Plaintiff and noted that x-rays of his lower leg were pending.  (Id, p. 27.)  The lab results which Plaintiff alleges Wingo falsely reported indicated that his Creatinine level of 1.4 was flagged as high, where the normal range was .6-1.3, and his Hemoglobin of 13.3 was charted as low, where the normal range was 13.5-18.0.  (Doc. No. 43, p. 73.)[5]

Based on this evidence, the Court finds as a matter of law that Defendant Wingo's actions did not violate Plaintiff's clearly-established right to be free from cruel and unusual punishment. There is no evidence that she acted with deliberate indifference to him, and there is no evidence that she recklessly disregarded information that would have prevented Plaintiff from further pain.  After

---

[5]The lab report also provides for the use of "critical" or "abnormal" flags, which did not appear on this report.  (Id.)

noting that he had previously improperly taken two-three tablets of Naproxen every three hours, and was not obtaining relief from Meloxicam, she changed his pain prescription to Indomethacin, twice a day. (Doc. No. 51-1, p. 27.) In addition, Plaintiff's allegations concerning his encounter with her in August, 2012, also do not support a finding of a constitutional violation. Therefore, the Court finds that Defendant Wingo is entitled to qualified immunity.

### iv. Defendants Langley and Miller

Plaintiff claims these Defendants failed in their roles as "gatekeepers" when conducting the triage of patients during sick call on February 6, 2012, February 17, 2012, July 9, 2012, and July 30, 2012. (Doc. No. 2, pp. 23-24.) According to the BOP policy, however, "Triage is defined as the classification of patients according to priority of need for examination and/or treatment. Triage allows truly urgent conditions to be addressed adequately on the same day, while also allowing more routine conditions or concerns to be addressed at a scheduled appointment." U.S. Department of Justice, Federal Bureau of Prisons Program Statement, P6031.01. (Doc. No. 2, p. 67.) The policy continues by stating that during Triage, the inmate provides a brief history, vital signs are taken if indicated, an appointment is scheduled within a time frame appropriate for the inmate's condition and medical needs, and if no follow-up is warranted, the inmate is advised of other options. (Id.)

Again, based on a review of the medical records, the Court finds that Defendants Langley and Miller did not violate a clearly established constitutional right. According to the Triage forms for January 23, 2012, February 6, 2012, February 17, 2012, and July 9, 2012, Plaintiff was placed on the call out list on these occasions. (Doc. No. 2, pp. 34, 48-49, 50-51, 103.) Plaintiff's claim that he should have immediately been seen, or that Defendants did not perform adequate triage

assessments of him amounts to a disagreement with their treatment decisions, which does not support a constitutional claim.   See Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000). Therefore, these Defendants also are entitled to qualified immunity.

**V.      Conclusion**

IT IS, THEREFORE, RECOMMENDED that Defendants' Motions for Summary Judgment (Doc. Nos.  44, 50) be GRANTED, and Plaintiff's Complaint against Defendants be DISMISSED with prejudice.

IT IS SO RECOMMENDED this 5th day of May, 2014.


_____

JEROME T. KEARNEY
UNITED STATES MAGISTRATE JUDGE